EXHIBIT A

**FILED**

**08 C 804**

**FEBRUARY 6, 2008**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| SAMANTHA FORD, on behalf of herself and all others similarly situated, | **JUDGE ST. EVE**<br>**MAGISTRATE JUDGE ASHMAN**<br><br>Case No.: _____ |
| Plaintiff, | |
| vs. | **CLASS ACTION COMPLAINT** |
| SPIN MASTER, LIMITED; SPIN MASTER, INCORPORATED; and DOES 1 through 10, | **J. N.** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

Plaintiff, Samantha Ford, by and through her attorneys, based on her individual experience and the investigation of counsel, on behalf of herself and all those similarly situated, alleges the following:

## I.   NATURE OF THE CASE

1.      This action is brought by Plaintiff on behalf of herself and all those similarly situated.  This action, brought on behalf of Illinois statewide residents and residents nationwide, seeks declaratory and injunctive relief on behalf of the Plaintiff and class members ("Class") who purchased the Chinese-made "Aqua Dots" toys designed, manufactured, distributed, marketed and/or sold by Defendants Spin Master, Limited, and Spin Master, Incorporated between April 2007 and November 2007.

2.      On November 7, 2007, the United States Consumer Product Safety Commission ("CPSC") announced that the coating on the Aqua Dots beads contains butanediol – a chemical that can be converted to the "date rape" drug gamma-hydroxy butyrate ("GHB").  The butanediol coating on Aqua Dots can turn toxic when the beads are ingested and metabolized.  Children who swallow the beads can become comatose, develop respiratory depression, vomit, have seizures or possibly die.  About 4.2 million Aqua Dots products have been sold through mass merchandisers nationwide and

internationally.  According to the CPSC, the toys should be immediately taken away from children.

3.    Upon information and belief, the only remedy available for consumers who return the Aqua Dots toy to Defendants is a free replacement of the beads or a toy of equal value.  Defendants are not offering a refund to consumers who return the product to Defendants as a result of the recall.  Additionally, retailers may or may not offer a refund to consumers who return the product as a result of the recall.

4.    As a result of Defendants' conduct, Plaintiff and the Class have suffered injury-in-fact and have lost money and/or property.  Plaintiff and the Class seek equitable relief, including permanently enjoining Defendants from engaging in the unlawful activities and practices complained of herein; an order requiring Defendants to implement safety systems such as third-party laboratory testing of all products imported from China and requiring Defendants to disclose the identity of the supplier responsible for coating Aqua Dots with the chemical that converts to GHB; and an order requiring Defendants to stop their current recall and implement a full recall with reasonable procedures that allow Plaintiff and the Class to easily participate in the recall; injunctive relief as described herein; and disgorgement of profits as described herein on behalf of Plaintiff and the Class.

## II.    JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(a)(2) because the suit is between a citizen of a state and a subject of a foreign state, and 28 U.S.C. § 1332(d) because Plaintiff and Class members are of diverse citizenship from one or more Defendants; there are more than 100 class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.  This Court also has personal jurisdiction over Defendants because Defendants are authorized to do business and in fact do business in this State, and Defendants have sufficient minimum contacts with this State

and otherwise intentionally avail themselves of the markets in this State through the distribution, promotion, marketing and sale of its products in this State, to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

6.     Venue is proper in this District under 28 U.S.C. §1391.  The claims asserted in this Complaint arise, in part, within this District.  A substantial part of the events and conduct giving rise to the violations of law complained of herein occurred or emanated from this District.  Additionally, Defendant Spin Master Limited is a foreign corporation. Defendants also conduct business with consumers in this District and have caused injury to Illinois residents.

### III.   THE PARTIES

7.     Plaintiff Samantha Ford ("Plaintiff") is the mother of a minor child.  Plaintiff purchased Aqua Dots Super Studio as a gift for her child on September 29, 2007. Plaintiff is a resident of Cook County, Illinois.

8.     Defendant Spin Master, Limited ("Spin Master, Ltd."), is a foreign business entity of unknown structure having its principal place of business at 450 Front Street West, Toronto, ON M5V1B6 Canada.  Spin Master, Ltd., distributes, markets, promotes and sells merchandise including Aqua Dots in the State of Illinois and nationwide. Defendant Spin Master, Ltd., conducts substantial business in the State of Illinois.  At all relevant times, Spin Master, Ltd., acted by and through its agents, servants, workers, employees, officers and directors, all of whom were acting through the course and scope of their actual and apparent authority, agency, duties or employment.

9.     Defendant Spin Master, Incorporated ("Spin Master, Inc."), is a Delaware corporation with its principal place of business and headquarters located at 300 International Drive, Suite 300, Williamsville, New York 14221.  Spin Master, Inc., is a wholly-owned subsidiary of Defendant Spin Master, Limited.  Upon information and belief, Defendant Spin Master, Inc., distributes, markets, promotes and sells merchandise

including Aqua Dots in the State of Illinois and nationwide.  Spin Master, Inc., conducts substantial business in the State of Illinois.  At all relevant times, Spin Master, Inc., acted by and through its agents, servants, workers, employees, officers and directors, all of whom were acting through the course and scope of their actual and apparent authority, agency, duties or employment.

10.     Doe Nos. 1 through 10 are persons and/or entities that are or were complicit in the scheme alleged herein.  The true identities of Does are currently not known to Plaintiff.  Plaintiff seeks to amend this complaint after the actual identities of Does are discovered.

11.     Defendants Spin Master, Ltd., and Spin Master, Inc., are herein referred to collectively as "Defendants."

## IV.    CO-CONSPIRATOR AND AGENCY ALLEGATIONS

12.     Various other persons, firms, and corporations, the identities which are presently unknown, have participated as co-conspirators with Defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

13.     The facts alleged herein have been committed by Defendants and their co-conspirators, or were authorized, ordered or done by their respective officers, agents, employees, or representatives while actively engaged in the management of each Defendant's business or affairs.

14.     Each of the Defendants named herein acted as the agent or joint venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein for the purpose of enriching themselves at the expense of consumers, resulting in damages to Plaintiff and the Class.

## V.    FACTUAL ALLEGATIONS

### A.  Aqua Dots Toys

15.    The Aqua Dots toy is a craft kit which allows children to create various multi-dimensional designs.

16.    These toys, sold under brand names including Aqua Dots and Aqua Beads, contain packets of brightly colored beads that children arrange into mosaics, then sprinkle with water; the beads then fuse together in as little as ten minutes to form durable artworks.

17.    The product is available in various different kits with accessories such as a drying fan, applicator pen, design templates for the beads, and spray bottle.  The products are marketed to children ages 4 and over.

18.    The Aqua Dots toys were sold at prices ranging from $17 to as much as $30.

19.    Defendants manufacture, distribute, market, promote and sell merchandise including Aqua Dots in the State of Illinois and nationwide.

20.    The toys identified in Paragraphs 15 and 19 are hereinafter referred to as "Aqua Dots".

### B.    Ingestion of GHB Has Harmful Effects on Young Children

21.    GHB is an odorless, colorless liquid that acts on the central nervous system as a depressant/anesthesia.  *See http://www.nida.nih.gov/Infofacts/RohypnolGHB.html.*

22.    GHB is naturally found in the human nervous system as well as in citrus fruits and wine.  Small doses are considered safe and are used to treat alcoholism, as a weight loss tool, a sedative and general anesthetic.

*See http://www.injuryboard.com/newspost.aspx?id=28376&googleid=28376.*

23.    Butanediol is a solvent, commonly used as a raw material in factories to manufacture some types of plastics and is converted into GHB after human ingestion. *See id.*

24.     The Food and Drug Administration ("FDA") in 1999 declared butanediol a Class I Health Hazard, meaning it can cause life-threatening harm.

*See http://www.cnn.com/2007/US/11/08/toys.daterapedrug.ap/index.html.*

25.     The Federal Hazardous Substance Act, 15 U.S.C. §1261(f)(1), defines household products that are toxic as "hazardous substances". Toys that are intended for use by children and that contain a hazardous substance in such a manner to be susceptible to access to children are automatically banned under 15 U.S.C. §1261(q).

26.     Butanediol is manufactured in China and elsewhere, including major multinational companies, and is also marketed over the Internet. *See id.*

27.     The most common effects of GHB after human ingestion include: euphoria, amnesia, intoxication, drowsiness, dizziness, nausea, amnesia, visual hallucinations, hypotension, brady-cardia, severe respiratory depression, and coma. In lower doses the most common side effects are: drowsiness, nausea, and hallucinations. In higher doses the most common side effects are: unconsciousness, seizures, severe respiratory depression, coma or death.

*See http://teenadvice.about.com/library/weekly/aa062502d.htm.*

28.     The FDA prohibited the sale and manufacture of GHB under the *Samantha Reid Date-Rape Prohibition Act of 2000*. Since then, GHB is associated with a more clandestine popularity as an illicit drug, particularly in the southeastern and western U.S. It currently is prevalent in the dance music scene (at raves and nightclubs) as an alternative to "ecstasy" and amphetamines. GHB often is used in conjunction with alcohol. It has been implicated as a "date rape" drug.

*See http://www.emedicine.com/emerg/topic848.htm.*

29.     According to the CPSC, the coating on the Aqua Dots beads that causes the beads to stick to each other when water is added, contains the chemical butanediol that can turn toxic when the beads are ingested. Scientists have found the toy's coating, once metabolized, converts into GHB.

*See http://www.cpsc.gov/cpscpub/prerel/prhtml08/08074.html.*

30.     According to the CPSC, children who swallow the beads can become comatose, develop respiratory depression or have seizures.  The CPSC has received several reports over the past several days of children swallowing the Aqua Dots beads.  A 20-month-old child in the U.S. swallowed several dozen beads.  He became dizzy and vomited several times before slipping into a comatose state for a period of time and was hospitalized.  A second child in the U.S. also vomited and slipped into a comatose state and was hospitalized for five days.  *See id.*

31.      Recently, U.S. officials have raised alarm about products manufactured in China.  Seafood containing harmful drugs, toothpaste with an ingredient found in antifreeze, and pet food containing a chemical used to make plastic came from China to the United States and were the subject of recalls.


**C.      The Discovery of the GHB Conversion in Aqua Dots Toys**

32.     In or around early October 2007, three Australian children were hospitalized after ingesting beads from the Bindeez toys, Australia's 2007 Toy of the Year and the Australian version of Aqua Dots.

33.     Two of the children, a two-year old boy and 10-year old girl, swallowed the beads and were both admitted to a Sydney, Australia hospital.  The third child, a 19-month old was also receiving medical help after ingesting the Bindeez beads.

34.     A biochemical geneticist, Dr. Kevin Carpenter in Sydney, Australia, identified the problem when the first Australian boy was hospitalized.  Australian doctors at Children's Hospital at Westmead first thought the boy had a genetic disorder or was given illegal drugs by a family member.  But Dr. Carpenter, using a mass spectrometer, said he saw a large peak of a "substance I didn't recognize."  A urine sample found GHB.  After two days, the compound dissipated from the boy's system confirming the symptoms were not genetic.  *See*

*http://www.nytimes.com/2007/11/08/business/worldbusiness/08recall.html?ex=13522644*
*00&en=3f5ba1b256983b9e&ei=5088&partner=rssnyt&emc=rss*

35.     On or around October 8, 2007, Dr. Carpenter contacted Moose Enterprise
PTY Limited of Australia, who referred him to the Moose Enterprise's Hong Kong
office.  The manufacturer provided Dr. Carpenter a list of the beads' ingredients.  The list
did not include the dangerous industrial chemical.  Dr. Carpenter said the manufacturer
was reluctant to provide details of how the beads were made.  "The manufacturer was
very keen that Moose not know what was in them," apparently to prevent Moose from
ordering identical beads from another manufacturer, Dr. Carpenter said.  *Id.*

36.     On November 2, 2007, Dr. Carpenter alerted the Ministry of Fair Trading of
New South Wales in Sydney.  On the same day, the hospital's poison control center sent
out a warning about the beads to poison centers around Australia.

37.     On November 3, 2007, a mother living near Dr. Carpenter's hospital found
her 10-year-old daughter motionless.  Then the girl began vomiting beads.  At the
hospital's poison control center, doctors recognized the symptoms immediately.  "Both
the children presented with a coma and seizure-like movements," said Dr. Naren Gunja,
the deputy director of the center.  *See id.*

38.     On November 6, 2007, Moose Enterprise ordered a recall of Bindeez beads in
Australia.  Dr. Carpenter said safety regulators should look beyond Bindeez to conduct
laboratory tests on all similar craft toys.

39.     On November 7, 2007, Peter Mahon, a Moose Enterprise spokesman, said the
company had ordered safety tests on Bindeez beads sold in more than 40 other countries,
including the U.S., but that it was awaiting results before deciding whether to expand its
recall beyond Australia.  But Amazon's British Web site, Amazon.co.uk, abruptly
stopped listing Bindeez products for sale.  Toys LiFung (Asia) of Hong Kong said that it
had removed all Bindeez items from the Toys "R" Us stores that it operates in Hong
Kong, Singapore and Malaysia.

40.    The Aqua Dots toys were supposed to be made using 1,5-pentanediol, a nontoxic compound found in glue, but instead contained the harmful 1,4-butanediol, which is widely used in cleaners and plastics.

*See http://www.cnn.com/2007/US/11/08/toys.daterapedrug.ap/index.html.*

41.    Moose Enterprise said that it reviewed the ingredients of the beads and found that some batches did not match the list of ingredients promised by the supplier. "The substitution was not at any time approved by Moose, nor was Moose made aware of any substitution by the supplier," the company said in a statement, adding that it would add a safe but foul-tasting ingredient to future beads to discourage children from eating them. Moose Enterprise declined to identify the supplier.

42.    Although it is not clear why 1,4-butanediol was substituted, it should be noted that there is a significant price difference between butanediol and pentanediol. The Chinese online trading platform ChemNet China lists the price of 1,4-butanediol at between about $1,350-$2,800 per metric ton, while the price for 1,5-pentanediol (the chemical that should have been used) is about $9,700 per metric.

*See http://www.cnn.com/2007/US/11/08/toys.daterapedrug.ap/index.html.*

43.    Bindeez has since been pulled from store shelves in Australia.

44.    China's General Administration of Quality Supervision, Inspection and Quarantine (AQSIQ) said the Bindeez toys were manufactured by the Wangqi Product Factory in China's southern city of Shenzhen.

45.    On November 7, 2007, Defendant Spin Master, Ltd., in conjunction with the CPSC, announced a recall of approximately 4.2 million Aqua Dots toys sold in the U.S. between April 2007 and November 2007.

46.    Defendants Spin Master, Ltd., executed the recalls because the coating on the beads, which Defendants designed, manufactured, distributed, marketed and/or sold, and that causes the beads to stick to each other when water is added, converts to GHB that

can turn toxic when many are ingested.  Upon information and belief, the Aqua Dots

were also manufactured in Shenzhen in the southern Guangdong province of China.

47.    On November 9, 2007, China banned the export of these toys.

48.    However, according to a December 21, 2007 *US Federal News* article, U.S.

Customs and Border Protection officers in Seattle intercepted several large shipments of

Aqua Dots toys in the early weeks of December 2007.

49.    According to a November 9, 2007 *The Washington Post* article, Congress is

considering legislation to require manufacturers to pay for independent tests by certified

labs following the recent recalls of dangerous toys from China.

### D.    Defendants Knew, Or Should Have Known, That Aqua Dots' Coating Converts to GHB

50.    Defendants knew, or should have known, that the coating on Aqua Dots

converts to the illegal GHB substance and presented a serious risk to the health and safety

of children.

51.    Defendants, however, failed to adequately screen and test the Aqua Dots

imported from China.

52.    Moreover, Defendants ignored recent reports of unsafe products imported

from China, including reports of toys containing impermissible and unsafe levels of lead,

seafood containing harmful drugs, toothpaste with an ingredient found in antifreeze, and

pet food containing a chemical used to make plastic.  These reports followed a recall in

November 2006 by Target and the CPSC of 190,000 toys and trucks made in China due

to paint containing excessive lead, and a recall in 2005 by Dollar General involving

similar circumstances.

**E.**   **Defendants Failed to Promptly Notify the CPSC Regarding the Unsafe Nature of Aqua Dots**

53.    Manufacturers, importers, distributors and retailers are required to notify the CPSC within 24 hours when they discover information relating to a dangerous defect in a product.

54.    Upon information and belief, Defendants learned about the unsafe nature of the Aqua Dots on November 4, 2007, when Defendants were notified by the Ministry of Fair Trading of the problem.

55.    Upon information and belief, Defendants notified U.S. retailers about the problem on November 7, 2007, approximately three days after discovering GHB in Aqua Dots or Bindeez toys in Australia.

56.    China's AQSIQ is the only entity that has confirmed that the Aqua Dots toys were manufactured by the Wangqi Product Factory.  Defendants still have not officially confirmed the name of their supplier responsible for coating Aqua Dots toys with butanediol that converts to GHB.  Thus, other toy companies are prevented from knowing for certain which suppliers to avoid.

**F.**   **Defendants' Recall  Program Does Not Provide Adequate Compensation**

57.    Plaintiff and the Class purchased an Aqua Dots toy sometime between April 2007 and November 7, 2007.

58.    Plaintiff purchased Aqua Dots reasonably believing that it was safe for her child to play with, including the knowledge that children often place toys in their mouths as well as their hands after coming into contact with the toys, like Aqua Dots, while playing.

59.    Defendants heavily marketed Aqua Dots to children and touted themselves as the most trusted named in toys.  Defendants, however, failed to disclose material

information to Plaintiff and the Class, namely, that the Aqua Dots contained a toxic chemical that converts to GHB, and that GHB poses a danger and health risk to children.

60.　　Upon information and belief, instead of offering Plaintiff and the Class full refunds of the purchase price paid for the Aqua Dots, Defendants only agree to provide free replacement beads or a toy of equal value.　Retailers may or may not offer full refunds for the purchase of Aqua Dots.　To obtain the replacement beads, Plaintiff and the Class follow onerous procedures.　First, the Plaintiff and the Class must submit an on-line form or call Defendants' recall hotline, and the Defendants will arrange to send a prepaid envelope in order for the purchaser to return the Aqua Dots beads.　Once received by Defendants, Defendants will arrange to send the consumer replacement Aqua Dots beads.

61.　　Most consumers, however, will not take the time to submit their contact information on-line due to the onerous procedures and also because most, if not all of Defendants' products, are manufactured in China and may present the same or different safety hazards.　Additionally, when a consumer calls the Aqua Dots recall hotline, the consumer is often placed on hold for a long period of time (in some cases, up to two hours).

62.　　As a result of Defendants' actions as alleged herein, Plaintiff and each Class member has suffered injury-in-fact and has lost money and/or property, notwithstanding Defendants' offer to provide replacement beads or a toy of equal value which is inadequate to compensate Plaintiff and the Class.

## VI.　CLASS ACTION ALLEGATIONS

63.　　For Counts One and Two, this action is brought as an Illinois statewide class action individually and on behalf of other similarly situated as a class action under Illinois Rule 735 ILCS 5/2-801, on behalf of a class initially defined as:

> All persons throughout the state of Illinois who purchased one or more Aqua Dots between April 1, 2007 through November 7,

2007, and were exposed to the Aqua Dots toys that were manufactured and/or distributed by Defendants subject to the recall announced by the CPSC on November 7, 2007. Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right to amend the class definition. Excluded from the Class are Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors. Also excluded from the Class is any judge or justice to whom this action is assigned, together with any relative of such judge or justice within the third degree of relationship, and the spouse of any such persons.

64.    For Counts Three and Four, this action is brought as a nationwide class action individually and on behalf of others similarly situated as a Class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of a class initially defined as:

All persons throughout the United States and its territories who purchased one or more Aqua Dots between April 1, 2007 through November 7, 2007, and were exposed to the Aqua Dots toys that were manufactured and/or distributed by Defendants subject to the recall announced by the CPSC on November 7, 2007. Upon completion of discovery with respect to the scope of the Class, Plaintiff reserves the right to amend the class definition. Excluded from the Class are Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors. Also excluded from the Class is any judge or justice to whom this action is assigned, together with any relative of such judge or justice within the third degree of relationship, and the spouse of any such persons.

65.    **Numerosity**: Membership in the Class is so numerous it is impractical to bring all Class members before the Court. The identity and exact number of Class members is unknown but can be determined from Defendants. It is estimated to be tens of thousands or more.

66.    **Commonality**: There are numerous and substantial questions of law and fact common to all of the members of the Class which control this litigation and predominate over any individual issues pursuant to Rule 23(b)(3). These common issues include, but are not limited to:

a.  Whether Defendants designed, manufactured, marketed and distributed toys containing 1,4-butanediol which can be converted to the toxin GHB when ingested;

b.  Whether Defendants advertised, represented or otherwise presented to the public toys that it manufactures, distributes and sells as safe and high quality;

c.  Whether Defendants falsely represented or omitted material information regarding the tainted toys or their recall;

d.  Whether Defendants engaged in unfair or deceptive trade practices under Illinois law and/or similar laws of other states;

e.  Whether Defendants asserted to disclaim any implied warranties;

f.  Whether Defendants intended for the toys to be purchased by Plaintiff and Class members, or other consumers for use by children;

g.  Whether using the toys as intended resulted in loss, injury and/or damages to Plaintiff and Class members;

h.  Whether the toys are inherently dangerous;

i.  Whether Defendants are refusing to adequately reimburse Plaintiff and the members of the Class for the cost of the toys;

j.  Whether, as a result of Defendants' omission and reckless conduct, children have been exposed to a known hazardous substance;

k.  Whether Plaintiff and other members of the Class are entitled to injunctive relief; and

l.  Whether Defendants have been unjustly enriched.

67.  **Typicality**:  Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the Class sustained damages arising out of the Defendants'

wrongful conduct as detailed herein.  Specifically, Plaintiff's claims and the Class members' claims arise from Defendants' failure to disclose the fact that the toxic chemical butanediol in Aqua Dots converts to GHB during the Class Period.

68.    **Adequacy**:  Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel competent and experienced in class action lawsuits.  Plaintiff has no interests antagonistic to or in conflict with those of the Class members and therefore should be an adequate representative for the Class members.

69.    **Superiority**:  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual members of the Class may in some instances be relatively small, the expense and burden of individual litigation make it impossible for such Class members individually to redress the wrongs done to them.  Also, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and possibly conflicting adjudications of the claims asserted herein.  There will be no difficulty in the management of this action as a class action.

## VII.  CLAIMS FOR RELIEF

### COUNT ONE
### Damages under the Illinois Consumer Fraud Act

70.    The preceding allegations are re-alleged and incorporated by reference as if fully set forth herein.

71.    Plaintiff and the Class are consumers within the meaning and coverage of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act"),  815 ILCS 505/1, et seq.

72.    The Illinois Consumer Fraud Act provides:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

73.    Because of its non-disclosure of material facts alleged above, Defendants deceived and continue to deceive Plaintiff and the other members of the Class. Defendants' deceptive conduct occurred in the course of its engaging in trade or commence.

74.    By advertising and marketing Aqua Dots in various media including broadcasts, website, and written promotional and other materials, Defendants have misled consumers about the safety of the toy as described above.  Defendants engaged in these deceptive acts and practices in order that Plaintiff and the Class members, in reliance thereof, would purchase Aqua Dots.

75.    The unfair and deceptive trade acts and practices of Aqua Dots have directly, foreseeably, and proximately caused damages to Plaintiff and the Class members.

76.    Defendants' actions and omissions to act, including the false and misleading express and/or implied representations and omissions of material fact regarding the safety of Aqua Dots, constitute acts, uses, or employment by Defendants and its agents of deception, unconscionable commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material

facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of a product, in violation of the Illinois Consumer Fraud Act, making such deceptive acts and practices illegal.

## COUNT TWO
## Damages under the Illinois Uniform Deceptive Trade Practices Act ("Deceptive Practices Act")

77.     The preceding allegations are re-alleged and incorporated by reference as if fully set forth herein.

78.     Plaintiff, the Class members, and Defendants are each a "person" within the meaning of 815 ILCS 510/1.

79.     At all times relevant hereto, Defendants conducted trade and commerce within the meaning of 815 ILCS 510/2.

80.     Defendants' unlawful conduct as described herein arose, is directed, and emanates from Defendants' headquarters to the detriment of Plaintiff in Illinois and throughout the United States.

81.     Defendants' actions and omissions to act, including the false and misleading express and/or implied representations and omissions of material fact regarding the safety of Aqua Dots, constitute acts, uses, or employment by Defendants and its agents of deception, unconscionable commercial practices, false pretenses, false promises, misrepresentations, or the knowing concealment, suppression, or omission of material facts with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of a product, making such deceptive acts and practices illegal a violation of the provisions of the Illinois Deceptive Practices Act 815 ILCS 510/2.

## COUNT THREE
### Breach of Implied Warranty Pursuant to the Illinois U.C.C.

82.    Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

83.    Under the Uniform Commercial Code in Illinois and in other states, there exists an implied warranty of merchantability.  *See* 810 ILCS 5/2-314.

84.    At the time that Defendants designed, manufactured, sold and/or distributed the toys, Defendants knew the purpose for which the toys were intended and impliedly warranted that the toys were of merchantable quality; were free of hazardous substances such as butanediol or GHB; were free of manufacturing defects; and were safe and fit for their ordinary purpose – play toys for children.

85.    Defendants designed, manufactured, sold and/or distributed the toys to parents, guardians, and other consumers of children's toys.

86.    Plaintiff and the Class relied upon the skill, superior knowledge and judgment of the Defendants to sell toys that were reasonably safe for use by children.  Plaintiff could not have known about the risks associated with the toys until after Defendants issued a public notice recalling the toys announcing that the toys were not safe or fit for the ordinary purpose and intended use, and were not free of manufacturing defects, but instead were potentially laden with butanediol or GHB, which are banned hazardous substances because of their extreme danger when ingested.

87.    Defendants breached their implied warranties under Illinois law in connection with the sale of the toys to Plaintiff and the Class.

88.    The Aqua Dots toys were unmerchantable because the products did not meet the capabilities as represented and marketed.

89.     As a direct and proximate result of Defendants' breach of implied warranties, Plaintiff and the Class have been and will suffer damages including economic damages, including the cost of the defective product.

90.     By reason of the foregoing, Defendant is liable to Plaintiff and the Class in an amount to be proved at trial.

## COUNT FOUR
## Unjust Enrichment

91.     Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

92.     Defendants received from Plaintiff and Class members certain monies from their purchase of Aqua Dots which are excessive and unreasonable, and are the result of Defendants' deceptive conduct.  The Aqua Dots sold by Defendants were unreasonably dangerous and unfit for their intended purpose.

93.     As a result, Plaintiff and the Class have conferred a benefit on Defendants, and Defendants have knowledge of this benefit and have voluntarily accepted and retained the benefit conferred on it.

94.     Defendants will be unjustly enriched if they are allowed to retain such funds, and each Class member is entitled to an amount equal to the amount each Class member enriched Defendants and for which Defendants have been unjustly enriched.

95.     By reason of the foregoing, Defendants are liable to disgorge to Plaintiff and the members of the Class the amount by which each Class member enriched Defendants and for which Defendants have been unjustly enriched.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Class, pray for judgment against Defendants as follows:

A.      For an order certifying the proposed nationwide Class herein under Federal Rule of Civil Procedure 23(a) and (b)(3), Illinois state class under 735 ILCS 5/2-801,  and appointing Plaintiff and Plaintiff's counsel of record to represent said Class;

B.      For an order that Defendants be permanently enjoined from engaging in the unlawful activities and practices complained of herein;

C.      Awarding actual, compensatory and consequential damages;

D.      For an order requiring Defendants to implement safety systems such as third-party laboratory testing of all products imported from China and requiring Defendants to disclose the identity of the supplier responsible for coating Aqua Dots with the chemical that converts to GHB;

E.      For an order awarding restitution and disgorgement of all monies paid by Plaintiff and the Class  because of Defendants' unlawful, unfair, and/or fraudulent business practices complained of herein;

F.      For an order requiring Defendants to stop their current recall and implement a full recall with reasonable procedures that allow Plaintiff and the Class to easily participate in the recall;

G.      Awarding punitive and treble damages as provided under relevant laws;

H.      For declaratory relief as this Court deems appropriate;

I.      For attorneys' fees and costs of suit, including expert witness fees;

J.      For an order awarding pre-judgment and post-judgment interest as prescribed by law; and

K.      For such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so triable.

DATED:  February 6, 2008

Samantha Ford, individually and on behalf of all others similarly situated,


**/s__William J. Harte**_____
William J. Harte
**WILLIAM J. HARTE LTD.**
111 West Washington Street
Suite 1100
Chicago, Illinois 60602
Telephone:  (312) 726-5015
Facsimile:  (312) 641-2455

*Attorneys Plaintiff Samantha Ford*

*Of Counsel:*

Mila F. Bartos
Tracy Rezvani
Karen J. Marcus
Rosalee B. Connell
**FINKELSTEIN THOMPSON LLP**
The Duval Foundry
1050 30th Street NW
Washington, D.C. 20007
Telephone:  (202) 337-8000
Facsimile:  (202) 337-8090